United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONALD DEMETRIUS THOMAS, Petitioner, v. WILLIAM MUNIZ, Respondent. | Case No. 15-cv-05783-JD  **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY** |

Ronald Thomas, a pro se state prisoner, has brought a habeas petition pursuant to 28 U.S.C. § 2254. The Court ordered respondent to show cause why the writ should not be granted. Respondent filed an answer and a memorandum of points and authorities in support of it, and lodged exhibits with the Court. Thomas filed a reply. The petition is denied.

## BACKGROUND

A jury found Thomas guilty of second degree murder with use of a firearm. *People v. Thomas*, No. A137389, 2014 WL 3366567, at *1 (Cal. Ct. App. July 10, 2014). He was sentenced to prison for 40 years to life. *Id*. at *3. On July 10, 2014, the California Court of Appeal affirmed the judgment. *Id*. at *1. The California Supreme Court denied Thomas' petition for review. Docket No. 10 at 24-47.

The California Court of Appeal summarized the facts as follows:

> Alvin Burns was fatally shot on the night of November 20, 2009. The Alameda County District Attorney filed an information charging appellant with murder (§ 187) and alleging he had personally and intentionally discharged a firearm and caused great bodily injury and death (§ 12022.53, subd. (d)), had personally and intentionally discharged a firearm (§ 12022.53, subd. (c)), and had personally used a firearm (§§ 12022.53, subd. (b), 12022.5, subd. (a)). At his jury trial, appellant was tied to the shooting primarily through the testimony of two eyewitnesses, Z.T. and P.L. FN. 2

> FN. 2  P.L. was declared unavailable as a witness and her preliminary hearing testimony was read to the jury. (Evid. Code, § 1291.)

Sixteen-year-old Z.T. and her teenage cousin P.L. met appellant, known as "D," in the fall of 2009. P.L. was being choked by a man on 88th Street in Oakland and appellant came to her rescue. He was carrying a small silver gun. The girls went to appellant's house that night and Z.T. saw him a few times after that. Appellant and Z.T. spoke on the phone "probably every other day."

On the night of November 20, 2009, about a month after meeting appellant, Z.T. and P.L. were celebrating the birthday of Alvin Burns. After going to a McDonald's restaurant and dropping another friend at his home, Burns and the girls decided to meet Tielee P, who lived at 88th Street and MacArthur Boulevard near the Youth Uprising center. At the time, Tielee was Z.T.'s boyfriend and P.L.'s "best friend." Burns was driving his Honda sedan, with P.L. riding in the front passenger seat, and Z.T. in the back passenger seat.

Burns parked the car near Tielee's apartment building with the engine still running. It was dark outside but there was light from a streetlight. After about 10 minutes, Z.T. noticed appellant walking by and said something about seeing "D." P.L. recognized appellant and called out to him. Appellant approached the passenger side of the car to see who was inside, leaned in to the open back passenger window, and said "What's up?" in a confrontational manner. Burns looked at appellant "like he didn't know him." Appellant was wearing gold grills on his teeth and a diamond earring in his left ear.

The car began to roll and appellant accused Burns of trying to run over his foot. Appellant pulled a gun from his hip and shot Burns in the back of the head. As far as Z.T. knew, appellant and Burns did not know each other.

The car came to a stop against the curb across the street, in front of the Youth Uprising building. Burns was slumped in the seat. Blood was everywhere. P.L. unsuccessfully attempted to pull Burns's foot from the gas pedal but was unable to do so, so she pulled the key from the ignition. Tielee approached the car and told P.L. to keep talking to Burns to see if he could hear her. Tielee told her appellant was the shooter and had been taking drugs and was drinking.

Police were dispatched to the scene of the shooting. Burns was taken to the hospital, where he later died of a gunshot wound to the head. An expended bullet was found on the floor of the car in front of the driver's seat and a spent .40–caliber casing was found in a gutter across the street, indicating the weapon used was a semiautomatic. No weapons were found in Burns's car.

Z.T. and P.L. gave written statements at the scene, but they did not

2

say they knew the shooter. They were placed in different patrol cars and taken to the police station for questioning, where they were separately interviewed. Z.T. seemed antagonistic and scared and did not want anyone to know she was at the police station. P.L. seemed upset and withdrawn. Z.T. held back at first because she was scared, but eventually she told police it was appellant who had shot Burns. P.L. was afraid of retaliation if she identified the shooter, and did not give appellant's name at first. She eventually admitted she knew the shooter and identified appellant. Both girls selected appellant's picture from a photographic lineup.

A few days after the shooting, officers approached appellant to arrest him as he was leaving a movie theater. Appellant ran down a ravine behind the theater, but was taken into custody after he tripped and fell. He was wearing a diamond earring in his left ear and officers found a set of gold grills and a cell phone in his pants pocket. A second cell phone, later associated with appellant, was found about 30 to 45 feet away. Police searched the home of appellant's girlfriend, who was with him at the time of his arrest, and found a birth certificate, Social Security card, and an identification card for the Youth Uprising center, all in appellant's name.

Cell phone records showed that calls were made from appellant's and Z.T.'s phones near the time of the murder that utilized the same cell phone tower, suggesting the phones were in the same area, though other calls made from Z.T.'s phone during that time frame utilized a different, nearby tower. The records also showed calls were made from appellant's cell phone to Z.T.'s cell phone that same night after the shooting in which the caller from appellant's phone blocked the number. Calls were made from Z.T.'s phone to appellant's phone between 4:25 a.m. and 6:11 a.m. on November 22, 2009.

P.L. told police she received a threatening call a couple of days after the shooting from a woman with a high-pitched voice who said, "Bitch, you are going to die." The voice sounded similar to one of the bystanders who helped them at the scene after the shooting. P.L. was 100 percent positive appellant was the shooter. She did not talk to Tielee after the shooting.

Z.T. did not receive any threats, though appellant and other people called her. She had not answered her cell phone because she did not want to talk about what had happened. She liked appellant as a friend and thought both he and Burns were nice people. Z.T. had not spoken to Tielee since the shooting. She had no doubt appellant was the shooter.

After giving an opening statement suggesting the evidence would show appellant was not at the scene of the crime, defense counsel called a single witness, DeAnna Ashorobi, who testified appellant was a friend of her daughter's and she had known him since he was 15 years old. Ashorobi had never heard of appellant being violent and had never known him to carry a gun. She believed him to be a "good kid," mild mannered and respectful. However, she had not heard appellant owned and carried guns; she had not heard he had

3

been involved in fights with a gang; she had not heard of his involvement in a kidnapping; she had not heard appellant's father and others held the kidnapping victim and fired shots at the victim's boyfriend when he arrived to retrieve the victim; and she had not heard appellant held the kidnapping victim at gunpoint and threatened her when he released her. If she had heard about the kidnapping and gun possession, it would affect her opinion and she would assume he was violent if he went to jail or prison for such conduct. Ashorobi had heard about the current homicide, but this did not alter her opinion because appellant had not been found guilty and she did not see him as the kind of person who would shoot someone in the head.

The jury was instructed on first and second degree murder and the firearm enhancement allegations. It acquitted appellant of first degree murder, convicted him of second degree murder, and found the enhancement allegations to be true.

Prior to sentencing, the court granted appellant's motion to relieve his retained trial attorney and substitute new retained counsel. This attorney filed a motion for new trial, asserting the trial attorney had provided ineffective assistance of counsel in several respects, including (1) presenting an opening statement promising an alibi defense that never materialized; (2) calling Ashorobi as a character witness, knowing she would be impeached with highly prejudicial "have you heard" questions about prior criminal acts and possession of firearms by appellant; and (3) failing to object to CALCRIM No. 371 regarding consciousness of guilt and threats to a witness by a third party.

The trial court denied the motion. It stated it had some concerns with the defense strategy of calling Ashorobi as a character witness, but that overall, some positive things came from her testimony in that she tended to humanize appellant. And, though the court had "significant concerns" and was "bothered" about the decision to go forward with an opening statement promising an alibi defense, any error was harmless in light of the very strong and believable testimony by Z.T., which was corroborated by the preliminary hearing testimony of P.L., and the jury's verdict of second, rather than first degree murder. The court noted if appellant testified and offered an alibi defense (as he apparently wished to do before his trial attorney convinced him not to take the stand), he would have been impeached by prior statements to the police as well as prosecution witnesses who would have shown the substance of the alibi was "based on lies." As to counsel's failure to object to CALCRIM No. 371 regarding consciousness of guilt and threats to a witness by a third party, the court recounted its discussion of the instruction with counsel and indicated the instruction was appropriate.

*Thomas*, 2014 WL 3366567, at *1-3 (footnote omitted).

**STANDARD OF REVIEW**

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under Section 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *See Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000). In conducting its analysis, the federal court must presume the correctness of the state court's factual findings, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

The state court decision to which § 2254(d) applies is the "last reasoned decision" of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d

1085, 1091-92 (9th Cir. 2005). When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the Court looks to the last reasoned opinion. *See Nunnemaker* at 801-06; *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000). In this case the Court looks to the opinion of the California Court of Appeal for the two claims in the petition.

As grounds for federal habeas relief, Thomas alleges that: (1) trial counsel was ineffective for failing to present alibi evidence as promised in his opening statement; and (2) trial counsel was ineffective by opening the door to damaging evidence placing Thomas' character at issue.

## INEFFECTIVE ASSISTANCE OF COUNSEL

### Legal Standard

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Id*.

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner must establish two things. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Strickland*, 466 U.S. at 687-88. Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance of counsel claims under § 2254. *See Cullen v. Pinholster*, 563 U.S. 170, 202 (2011); *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (same). The general rule of *Strickland*, i.e., to review a defense counsel's effectiveness with great deference, gives the state courts greater leeway in reasonably applying that rule, which in turn "translates to a narrower range of decisions that are objectively unreasonable under AEDPA." *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). When § 2254(d) applies, "the question is not

whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington*, 562 U.S. at 105. *See, e.g., Demirdjian v. Gipson,* 832 F.3d 1060, 1072-74 (9th Cir. 2016) (rejecting claim that counsel was ineffective by failing to challenge statements by prosecutor as either improper comments on petitioner's decision not to testify, or improper shifting of burden of proof to defense, because there is reasonable argument that, because there was no prosecutorial error, defense counsel's decision to rebut prosecutor's comments in closing argument rather than object at trial was adequate).

**Background**

The California Court of Appeal set forth the relevant background for these two claims:

> During the hearing on motions in limine, the prosecutor indicated he had just learned about appellant's participation in a kidnapping orchestrated by appellant's father several months before the shooting. The court granted the prosecutor's motion to allow (1) cross-examination of any character witness called by the defense with "have you heard" questions relating to the kidnapping (*see People v. Marsh* (1962) 58 Cal. 2d 732, 745 [it is "within the ambit of proper cross-examination of a character witness to inquire, in good faith, whether the witness has heard of specific misconduct of the defendant inconsistent with the trait of character testified to on direct"] ); and (2) extrinsic evidence of the kidnapping incident to impeach appellant's credibility should he testify (*see People v. Cadogan* (2009) 173 Cal. App. 4th 1502, 1509 [past criminal conduct involving moral turpitude that has some logical bearing on veracity is admissible for impeachment]; *People v. Zataray* (1985) 173 Cal. App. 3d 390, 399–400 [kidnapping is crime of moral turpitude admissible for impeachment purposes] ).
>
> At the beginning of the trial, defense counsel indicated he would reserve his opening statement and present it at the close of the prosecution's case-in-chief. After the prosecution rested its case, defense counsel gave the following opening statement: "Good afternoon, everyone. I'm going to give you a brief opening statement. You have heard a lot of evidence so far, but you haven't heard the whole case yet. My client is not guilty of any of these charges. He is presumed innocent until all the evidence comes in. And when all this evidence comes in, the People will not have met their burden to prove beyond a reasonable doubt that Mr. Thomas is the person that shot the victim in this case. The witness—it will come out that the witnesses are not credible; that Mr. Thomas was not present. They have to prove to you that Mr. Thomas was present at the scene, not in or about the area of the scene. He has to be there, actually be the one doing the shooting. That's not going to pan out in this evidence. The charge here is murder in the first degree. Someone did in fact from the evidence you know kill Alvin

7

> Burns, but it was not—the prosecution will not be able to show that it was my client because he was elsewhere. He was not at the scene of the crime. That's what the evidence will show. Thank you."
>
> After giving this opening statement, defense counsel called Ashorobi as a witness, who testified about appellant's nonviolent character on direct examination. Ashorobi was then asked a series of "have you heard" questions during cross-examination regarding appellant's involvement in the prior kidnapping, his possession of guns, and his involvement in a fight with a gang. She indicated she had heard none of these things, but if they were proved they would change her opinion about appellant's character.
>
> When Ashorobi's testimony was complete, defense counsel asked to approach the bench and advised the court he did not want appellant to testify as planned because he would be questioned by a "skilled cross-examiner" and his testimony would likely be impeached with evidence about the prior kidnapping. Defense counsel asked for more time to discuss the matter of testifying with appellant. Court was adjourned for the day and the following morning, defense counsel rested without calling any additional witnesses.

*Thomas*, 2014 WL 3366567, at *5.

**Discussion**

**Alibi Evidence**

Thomas first argues that trial counsel was ineffective for making an opening statement where he indicated he would present alibi evidence, but then failed to present such evidence. The California Court of Appeal denied this claim.

> Defense counsel's opening statement suggested the jury would hear evidence appellant was somewhere other than the scene of the crime when Burns was shot. Apparently, counsel still believed appellant would testify and present an alibi defense. But the reasons counsel gave the court shortly after his decision to try to dissuade appellant from taking the stand (the expertise of the prosecutor as a cross-examiner and the prejudice that would result from impeachment evidence regarding the kidnapping) were known from the outset of the trial. We share the trial court's concern about defense counsel's decision to suggest an alibi defense when it appears he should have known at the time of the opening statement it would be improvident for appellant to testify. FN 5. Ultimately, though, we need not resolve whether counsel's actions fell beyond the range of reasonable trial tactics because any error in making the opening statement was harmless. (*Strickland*, *supra*, 466 U.S. at pp. 694–695; *Rodrigues*, *supra*, 8 Cal. 4th at p. 1126.)
>
> > FN 5. In a declaration submitted with the motion for new trial, appellant stated he and his trial attorney had agreed before the trial began that appellant would testify, and the issue was not revisited until the day counsel gave his opening statement, when he urged appellant not to take the

8

stand.

The decision to forgo alibi testimony by appellant himself is not challenged on appeal and appears reasonable in light of the potential for impeachment with highly prejudicial information about the prior kidnapping. There is no suggestion any other witness could have given testimony supporting a persuasive alibi defense. Absent any evidence of an alibi, the crucial issue for the jury to resolve was whether Z.T. and P.L. were credible when they identified appellant as the shooter.

The trial court, which presided over the entire case and observed the demeanor of the witnesses firsthand, found Z.T. to be "as good or better than any other witness I have ever seen. There were some times when she cried on the witness stand. She did not seem to be pandering her answers to one side or the other . . . . And when you look at her answers what, at first, seemed to be inconsistent answers, depending on who was asking the question, ultimately showed to be quite consistent, that her testimony was consistent throughout, front to back, and as each attorney asked about a different aspect, her answer might have changed because she was answering that question. And ultimately it was clarified that at the time that the shot was fired, she was looking down, but she recognized Mr. Thomas' voice, and Mr. Thomas['] voice was not the voice that she heard for the first time that day, but someone who she had a significant amount of contact with in the months before that, a lot of telephone contact. She didn't seem to me to be siding with one side or the other. She seemed to me to be a person who had positive feelings toward Mr. Thomas, as well as positive feelings towards the victim in this case. Her identification of Mr. Thomas was very strong . . . . It was very certain. It was based on having known Mr. Thomas for some period of time, having recognized him from a distance away, having recognized him walking toward the vehicle . . . ." The court also noted P.L. "overwhelmingly corroborated" Z.T.'s testimony in material respects. "The fact that there are two percipient witnesses who had preexisting relationships with the defendant who both affirmatively and positively and 100 percent identified the defendant as the shooter, that's very strong evidence indeed." Finally, the court observed the identification was further corroborated by cell phone records showing appellant was in the general area of the shooting, by the gold grill found on his person at the time of his arrest, and by his Youth Uprising membership card that was found at his girlfriend's house.

Substantial evidence supports the trial court's determination Z.T. was a credible witness, and we defer to that finding. (*Taylor*, *supra*, 162 Cal. App. 3d at p. 726.) Her persuasive testimony, corroborated by the other evidence described by the trial court, identified appellant as the shooter. Once the jury determined appellant was the shooter, the jury's only realistic choices were first or second degree murder. It convicted appellant of the lesser of these two offenses.

Though defense counsel's opening statement alluded to an alibi defense that was not ultimately presented, it focused more on the credibility of prosecution witnesses and made no promise that any particular defense witness would testify. It is not reasonably

9

> probable appellant would have secured an acquittal had defense counsel refrained from making his opening statement or limited its contents to an attack on witness credibility, even if such a strategy would have been preferable in hindsight. (*Strickland*, *supra*, 466 U.S. at pp. 694–695.)

*Thomas*, 2014 WL 3366567, at *6-7.

The state court did not decide if counsel was deficient because, regardless, there was no prejudice. This finding was not objectively unreasonable. Even assuming that counsel was deficient in mentioning alibi evidence in the opening statement and then not following through and presenting such evidence, there was substantial evidence demonstrating Thomas' guilt. The state court described the credible and extensive testimony of the witness, who knew Thomas, and this testimony was corroborated by the other witness, who also had a preexisting relationship with Thomas. In addition, the cell phone records placed Thomas in the vicinity of the murder and show that he called one of the witnesses around that time.

The Court agrees with the findings of the trial court and California Court of Appeal that while counsel's decision to suggest an alibi defense mostly likely fell below prevailing professional norms, Thomas cannot demonstrate prejudice. Thomas cannot meet his burden in showing that had counsel not made this error, the result of the proceeding would have been different. Had counsel not mentioned the ultimately never presented alibi defense, there was still substantial evidence of Thomas' guilt as discussed above. Thomas has not demonstrated that the state court decision was an unreasonable application of *Strickland*; therefore, this claim is denied.

**Character Evidence**

Thomas next argues that trial counsel was ineffective by calling Ashorobi, a character witness who opened the door to damaging evidence of Thomas' character. The California Court of Appeal denied this claim.

> Appellant contends defense counsel was ineffective in calling Ashorobi as a character witness, knowing she would be cross-examined with a series of "have you heard" questions about a "litany of unsavory behavior on appellant's part." The decision to call a particular witness is generally a matter of trial tactics "unless the decision results from unreasonable failure to investigate." (*People v. Bolin* (1998) 18 Cal. 4th 297, 334.) The decision to call Ashorobi does not appear to be the product of ignorance on the part of defense counsel, who knew in advance she could be impeached by the "have you heard" questions.

10

> Even assuming the tactical decision to call Ashorobi was unreasonable, appellant has failed to demonstrate prejudice for the reasons stated in the preceding section of this opinion. Given the evidence presented, and the strength of Z.T.'s testimony in particular, there was very little potential for a verdict other than first or second degree murder. The jury chose the lesser of these options, showing it was not unduly swayed by the prosecutor's references to the prior kidnapping and possession of firearms. The trial court specifically instructed the jury it could not consider the prosecutor's questions for the truth of the matters asserted. Though, as appellant notes, the prosecutor referred to this line of cross-examination during closing argument, the jury was instructed the attorneys' remarks during opening statement and closing argument were not evidence. We presume the jury followed these admonitions. (*People v. Coffman and Marlow* (2004) 34 Cal. 4th 1, 83.)

*Thomas*, 2014 WL 3366567, at *7 (footnote omitted).

The state court did not find that counsel was deficient, and, even if the decision to call the character witness was deficient, there was no prejudice. This finding was not an unreasonable application of Supreme Court authority. When applying § 2254(d), "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington*, 562 U.S. at 105. There are reasonable arguments in support of counsel's decision to call the character witness. As discussed above, there was substantial evidence of Thomas' guilt. Once counsel decided not to have Thomas testify, it was a reasonable tactical decision to present some evidence in defense in light of the damaging testimony of the witnesses. This Court must review trial counsel's effectiveness with great deference, and Thomas has failed to meet his burden in showing that the trial counsel was deficient in calling Ashorobi to testify as a character witness.

Even assuming that trial counsel was deficient, Thomas cannot demonstrate prejudice. For the same reasons noted above, there was substantial evidence of Thomas' guilt. Thomas has not shown that had trial counsel not presented the character witness, a reasonable probability that the result of the proceeding would have been different exists. For all these reasons, this claim is denied.

11

## CERTIFICATE OF APPEALABILITY

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability. *See* Rules Governing § 2254 Cases, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard. *Id*. § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, petitioner has made no showing warranting a certificate and so none is granted.

## CONCLUSION

1. For the foregoing reasons, the petition for writ of habeas corpus is **DENIED**. A Certificate of Appealability is **DENIED**. *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

2. The Clerk shall close this case.

**IT IS SO ORDERED.**

Dated: January 16, 2018

JAMES DONATO
United States District Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONALD DEMETRIUS THOMAS,<br>　　　　Plaintiff,<br>　　v.<br>WILLIAM MUNIZ,<br>　　　　Defendant. | Case No. 15-cv-05783-JD<br><br>**CERTIFICATE OF SERVICE** |

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on January 16, 2018, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Ronald Demetrius Thomas ID: AN0774
Salinas Valley State Prison-Facility C 71266
P.O. Box 1050
Soledad, CA 93960

Dated: January 16, 2018

　　　　　　　　　　　　　　　　　　　　Susan Y. Soong
　　　　　　　　　　　　　　　　　　　　Clerk, United States District Court

　　　　　　　　　　　　　　　　　　　　By: /s/ Lisa R. Clark
　　　　　　　　　　　　　　　　　　　　LISA R. CLARK, Deputy Clerk to the
　　　　　　　　　　　　　　　　　　　　Honorable JAMES DONATO

13